JUDGE FRANK MONTALVO

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

FILED

2023 JAN 20  AM 10: 54

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY

| | |
|---|---|
| **ERIK SALAIZ,** | § |
| | § |
| **Plaintiff,** | § |
| | § |
| | § |
| v. | § |
| | § |
| **EXCLUSIVE MARKETING AGENCY LLC,** a | § |
| California Limited Liability Company, **JOHN** | § |
| **SECKEL, INSTANT LOANS, INC** d/b/a | § |
| **ASSUR LOANS,** a Michigan Corporation, and | § |
| **CELEBRITY HOME LOANS, LLC** d/b/a | § |
| **MIDWEST EQUITY MORTGAGE,** a Illinois | § |
| Limited Liability Company | § |
| **Defendants.** | § |
| | § |

EP23CV0028

## PLAINTIFF'S ORIGINAL COMPLAINT

### PARTIES

1.   Plaintiff ERIK SALAIZ is a natural person and is a citizen of the Western District of Texas and was present in the Western District of Texas during all calls at issue in this case.

2.   Defendant EXCLUSIVE MARKETING AGENCY LLC ("EMA") is a limited liability company organized and existing under the laws of California and can be served via registered agent John Seckel at 12707 High Bluff Drive, Suite 200, San Diego, California

3.   Defendant JOHN SECKEL ("Seckel") is a resident of California, chief executive officer of Defendant EMA and can be served at 14914 Rivawill Court, San Diego, California 92127.

4.   Defendant INSTANT LOANS, INC d/b/a Assur Loans ("Assur") is a corporation organized and existing under the laws of Michigan with its principal office located at 27231 Cambridge Lane Farmington Hills, MI 48331 and is a foreign registered corporation in Texas

1

and can be served via registered agent Registered Agents Inc. at 5900 Balcones Drive. Ste. 100 Austin, TX 78731.

5.     Defendant CELEBRITY HOME LOANS, LLC d/b/a Midwest Equity Mortgage ("Celebrity") is a limited liability company organized and existing under the laws of Illinois with its principal office located at 1 Mid America Plaza, Ste 800 Oakbrook Terrace, IL 60181 and is a foreign registered limited liability company in Texas and can be served via registered agent Corporation Service Company D/B/A CSC- Lawyers Inco at 211 E. 7th Street Suite 620 Austin, TX 78701.

6.  Defendants EMA, Seckel, Assur, and Celebrity are hereinafter referred to collectively as ("Defendants").

## **NATURE OF ACTION**

7.     As the Supreme Court recently explained, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. . .. For nearly 30 years, the people's representatives in Congress have been fighting back." *Barr v. Am. Ass'n of Pol. Consultants LLC*, 140 S. Ct. 2335, 2343 (2020).

8.     Plaintiff Erik Salaiz ("Plaintiff") brings this action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, alleging that Defendants placed illegal unauthorized telemarketing phone calls to him in violation of the TCPA.

9.     Defendants Assur and Celebrity offer mortgage loan services to consumers.  As part of marketing their services, Defendants Assur and Celebrity hired and authorized Defendant EMA to place illegal unauthorized phone calls to Plaintiff's cell phone that used an automatic telephone dialing system ("ATDS").

2

10.     Plaintiff never consented to receive any of these phone calls, which were placed to him for telemarketing purposes.

## JURISDICTION AND VENUE:

11.     This Court has federal subject matter jurisdiction under 28 U.S.C. § 1331, as this case arises under the Telephone Consumer Protection Act, 47 U.S.C. § 227, which is a federal statute.

12.     This Court has supplemental subject matter jurisdiction over Plaintiff's claims arising under Texas Business and Commerce Code 305.053 because that claim arises from the same nucleus of operative fact, i.e., Defendants' telemarketing calls to Plaintiff, and adds little complexity to the case, so it is unlikely to predominate over the TCPA claims.

13.     This Court has personal jurisdiction over the Defendants because they conduct business in this District and in the State of Texas and because the events giving rise to this lawsuit occurred in this District.

14.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Defendants regularly conduct business in the State of Texas and in this District, and because the wrongful conduct giving rise to this case occurred in this District.

## THE TELEPHONE CONSUMER PROTECTION ACT OF 1991, 47 U.S.C. § 227

15.     In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*. Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

16.     The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

17.     The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

18.     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

19.     Separately, the TCPA bans making telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

20.     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

21.     According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

22.     The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

23.     The FCC requires "prior express written consent" for all autodialed or prerecorded

telemarketing robocalls to wireless numbers and residential lines.  In particular:[A] consumer's

written consent to receive telemarketing robocalls must be signed and be sufficient to show that

the consumer:  (1) received clear and conspicuous disclosure of the consequences of providing

the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded

messages by or on behalf of a specific seller; and (2) having received this information, agrees

unambiguously to receive such calls at a telephone number the consumer designates. In addition,

the written agreement must be obtained without requiring, directly or indirectly, that the

agreement be executed as a condition of purchasing any goods or service.

24.     *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,

27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC

regulations "generally establish that the party on whose behalf a solicitation is made bears

ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing

the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

25.     The FCC confirmed this principle in 2013, when it explained that "a seller …may be held

vicariously liable under federal common law principles of agency for violations of either section

227(b) or section 227(c) that are committed by third-party telemarketers." In the Matter of the

Joint Petition Filed by Dish Network LLC, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

26.     Under the TCPA, a text message is a call. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663

(2016).

27.     A corporate officer involved in the telemarketing at issue may be personally liable under

the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist.

LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate

actors can be individually liable for violating the TCPA where they had direct, personal

participation in or personally authorized the conduct found to have violated the statute." (internal

quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D.

Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability,

the TCPA would lose much of its force.").

## FACTUAL ALLEGATIONS:

28.    Plaintiff successfully registered his personal cell phone number (XXX) XXX-0898 on the

National Do-Not-Call Registry since August 19, 2021, which was more than 31 days prior to

receiving the alleged calls.

29.    Plaintiff never asked the National Do-Not-Call Registry administrator to remove him

from the National Do-Not-Call Registry and Plaintiff was on the National Do-Not-Call Registry

at all times relevant to this Complaint.

30.    Defendant EMA is a marketing company that offers mortgage leads to mortgage

companies including to Defendants Assur and Celebrity.

31.    Defendant EMA is owned and operated by Defendant Seckel.

32.    Defendants Assur and Celebrity offer mortgage loan services to consumers.

33.    Defendant Assur is owned and operated by Peter Elia.

34.    Defendant Celebrity is owned and operated by David Robnett.

35.    Defendants Assur and Celebrity hired and authorized Defendant EMA to make

unauthorized phone calls to thousands of consumers *en masse* using an ATDS to solicit mortgage

loan services on behalf of Defendants Assur and Celebrity.

36.    Each and every phone call Plaintiff received from Defendant EMA's representatives

calling on behalf of Defendants Assur and Celebrity were made using an ATDS.

37.    Defendants Assur and Celebrity approve of the contracts with Defendant EMA.

38.    Defendants Assur and Celebrity pay Defendant EMA out of bank accounts they own and control.

39.    Defendant EMA's representatives make unauthorized solicitation calls to thousands of consumers *en mass* using an ATDS at the apparent authority from Defendant Seckel.

40.    Defendant Seckel knowingly and willfully authorizes the calls that violate that TCPA for his financial benefit.

41.    Defendants Assur and Celebrity are well aware that the unauthorized phone calls being made on their behalf soliciting their mortgage loan services violate the TCPA.

42.    Defendants Assur and Celebrity knowingly and willfully violate the TCPA because doing so benefits them financially.

43.    Plaintiff received at least sixteen (16) illegal unauthorized phone calls to his personal cell phone 0898 within a twelve-month period from Defendant EMA calling on behalf of Defendants Assur and Celebrity soliciting their mortgage loan services ("the calls").

44.    The calls 1-9 and 14-15 were made using an ATDS that has the capacity to store and produce telephone numbers to be called, using a random or sequential number generator and to dial such numbers.

45.    The calls 1-9 and 14-15 all started with a 3-4 second delay of dead air followed by an audible beep (indicating the calls were made using an ATDS) before connecting Plaintiff to Defendant EMA's representatives.

46.    With information and belief Plaintiff received more calls from Defendant EMA within the past two years that are unknown to Plaintiff at this time but will be revealed during discovery.

7

47.    On October 13, 2022, Plaintiff received one of multiple calls to his personal cell phone 0898 from Defendant EMA calling on behalf of Defendants Assur and Celebrity from (915) 493-2404.

48.    Plaintiff answered and there was a 3-4 second delay before being connected to a female representative named Hanna from Defendant EMA calling on behalf of Defendants Assur and Celebrity.

49.    Hanna advised Plaintiff that she was calling from "American Financial."

50.    Defendant EMA trains their representatives not to reveal their true identity and say their calling from "American Financial" in order to duck liability for violating the TCPA.

51.    Plaintiff was extremely annoyed and frustrated for continuing to receive the same phone calls from representatives calling from "American Financial" soliciting mortgage refinance loans and cash out option services and advised Hanna that he was interested in a mortgage refinance and cash out option for the sole purpose of identifying the companies responsible for the calls.

52.    Hanna then asked Plaintiff qualifying questions about his mortgage interest rate, mortgage balance, monthly mortgage payment, mortgage value and credit score.

53.    Hanna transferred Plaintiff to her "senior supervisor" named Ron.

54.    Ron then verified Plaintiff's mortgage interest rate, mortgage balance, monthly mortgage payment, mortgage value and credit score.

55.    Ron advised Plaintiff he will bring on the "loan officer" so he can show Plaintiff the rates.

56.    Ron's first attempt to transfer Plaintiff failed and advised Plaintiff he was going to try again.

57.     Ron then transfers Plaintiff to a "loan officer" named Conor Riley from Defendant

Celebrity by saying:

"Hello Mr. Loan Officer? My name is Ron I have Mr. Erik Salaiz on the line from Texas is on a 5% conventional loan entrusted to take 50 thousand out, credit score is excellent if you can take the call please?

58.     Conor accepted the transfer from Ron which confirmed Defendant Celebrity hired and

authorized Defendant EMA to call thousands of consumers soliciting Defendant Celebrity's

mortgage loan services for their financial gain.

59.     Conor verified Plaintiff's mortgage interest rate, mortgage balance, monthly mortgage

payment, mortgage value and solicited Plaintiff for a cash out option on behalf of Defendant

Celebrity.

60.     Plaintiff received an email from Conor from Conor@Celebrityequity.com. *See Exhibit A.*

61.     The email Plaintiff received from Conor revealed one company responsible for the calls.

62.     While on the call with Conor, Plaintiff received three incoming calls from phone number

(248) 225-0720. *See Exhibit B.*

63.     Following the three missed calls, Plaintiff received a text message from the same phone

number (248) 225-0720 from a representative named Matt Meram that was calling on behalf of

Defendant Assur. *See Exhibit C.*

64.     The text message Plaintiff received from Matt stated,

"Hi, Eric, looks like we got disconnected. My name is Matt, I am the Senior banker you were transferred to. I couldn't hear anything. Give me a buzz back or we can text. What were you looking to accomplish so I can help out."

65.     Plaintiff received an email from Matt from mattmeram@assureloans.com. *See Exhibit D.*

66.    The text messages and email Plaintiff received from Matt revealed another company responsible for the calls as Matt received Plaintiff's information as a lead from Defendant EMA's representative Ron.

67.    Ron emailed Plaintiff's information to Matt as a "lead" when the first transfer failed in paragraph 56.

68.    On December 20, 2022, Plaintiff received a phone call to his personal cell phone 0898 from phone number (915) 493-2660.

69.    Plaintiff answered and there was a 3-4 second delay before being connected to the same Representative Ron from Defendant EMA and the call dropped.

70.    A few hours later Plaintiff received another call from Ron from phone number (915) 493-2795.

71.    Ron asked for Plaintiff's mortgage interest rate, mortgage balance, monthly mortgage payment, mortgage value and credit score.

72.    Ron advised Plaintiff he was going to transfer him to his "loan officer."

73.    Ron then transfers Plaintiff to the "loan officer" named Frank from Defendant Celebrity by saying:

"Hello Frank, this is Ron I have Mr. Erik Salaiz with me here on the line Mr. Salaiz is paying a 5 percent interest rate mortgage balance $180 property value $400 Mr. Salaiz will be interested to get a quote for a cash out refinance of $50,000 can you take the call?"

74.    Frank accepted the transfer from Ron which confirmed again Defendant Celebrity hires and authorizes Defendant EMA to call thousands of consumers soliciting Defendant Celebrity's mortgage loan services.

75.    The call dropped after Frank accepted the transfer.

76.     A few hours later on the same day December 20, 2022, Plaintiff received another call from phone number (619) 208-0466.

77.     Plaintiff answered and was greeted by a representative named Shane Smith from Defendant Celebrity. Shane advised Plaintiff he was following back up from the conversation Plaintiff had with "one of his colleagues" Frank.

78.     Shane verified Plaintiff's mortgage information and solicited Plaintiff for a cash out option on behalf of Defendant Celebrity.

79.     Plaintiff received an email from Shane from email shane@celebrityhomeloans.com. *See Exhibit E.*

80.     Plaintiff asked Defendants Assur and Celebrity's representatives to send Plaintiff an email on multiple occasions for the sole purpose of confirming their true identity.

81.     Plaintiff has never had an established business relationship with any of the Defendants and did not give his prior express written consent to receive any of the alleged phone calls from or on behalf of any of the Defendants.

82.     With information and belief Defendants Assur and Celebrity share a portal or database with Defendant EMA which allows Defendant EMA's representatives to transfer potential client leads directly to Defendants Assur and Celebrity's systems.

83.     On eight (8) occasions Defendant EMA spoofed the caller ID to Plaintiff's local area code (915) to trick Plaintiff into thinking the calls were local.

84.     On or about January 7, 2023, Plaintiff sent an email to Peter Elia advising him of unauthorized phone calls he received to his personal cell phone from representatives soliciting mortgage refinance services on behalf of Defendant Assur.

85.    On or about January 9, 2023, Plaintiff received an email from Peter Elia explaining that Defendant Assur had an agreement with Defendant EMA to make calls on behalf of Defendant Assur.

86.    The email Plaintiff received from Peter Elia further explains and shows Defendant EMA provided Defendant Assur Plaintiff's information as a "lead" that generated through illegal telemarketing. *See Exhibit F.*

87.    The email Plaintiff received from Peter Elia also confirmed the calls Plaintiff received were initiated from Defendant EMA's representatives on behalf of Defendant Assur and Celebrity.

88.    Table A below summarizes the phone calls Plaintiff received from or on behalf of Defendants:

Table A:

| Number: | Date | Time | Caller ID | Notes |
|---|---|---|---|---|
| 1 | 08/30/2022 | 2:09 PM | 915-490-0833 | Rep calling from EMA |
| 2 | 09/01/2022 | 04:24 PM | 915-490-7250 | Rep calling from EMA |
| 3 | 09/08/2022 | 5:55 PM | 915-493-2637 | Rep calling from EMA |
| 4 | 09/12/2022 | 04:56 PM | 903-422-7722 | Rep calling from EMA |
| 5 | 09/13/2022 | 10:11 AM | 903-422-7722 | Rep calling from EMA |
| 6 | 09/21/2022 | 04:43 PM | 903-422-7722 | Rep calling from EMA |
| 7 | 09/30/2022 | 12:45 PM | 915-493-2242 | Rep calling from EMA |
| 8 | 10/04/2022 | 08:33 AM | 915-490-3049 | Rep calling from EMA |
| 9 | 10/13/2022 | 11:41 AM | 915-493-2404 | Hanna calling from EMA. Transferred to Ron from EMA. Transferred to Conor from Celebrity. |
| 10 | 10/13/2022 | 11:47 AM | 248-225-0720 | Missed call from Matt from Assur |
| 11 | 10/13/2022 | 11:47 AM | 248-225-0720 | Missed call from Matt from Assur |
| 12 | 10/13/2022 | 11:48 AM | 248-225-0720 | Missed call from Matt from Assur |
| 13 | 10/13/2022 | 11:49 AM | 248-225-0720 | Text from Matt from Assur |
| 14 | 12/20/2022 | 9:21 AM | 915-493-2600 | Ron calling from EMA call dropped |

| 15 | 12/20/2022 | 11:26 AM | 915-493-2795 | Ron calling from EMA. Transferred to Frank from Celebrity call dropped. |
| 16 | 12/20/2022 | 3:34 PM | 619-208-0466 | Direct call from Shane from Celebrity. Emailed his info. |

89.    Defendants employ outrageous, aggressive, and illegal sales techniques that violate multiple federal laws and state consumer statutes.

90.    Defendant EMA and their agents and co-conspirators amassed lists of thousands of potential customers from public records, and data aggregators, and then placed phone calls using an ATDS *en masse* to market their mortgage refinance loans and cash out options on behalf of Defendants Assur and Celebrity.

91.    Defendants have knowledge of and have adopted and maintained TCPA violations as a sales strategy. Defendants Assur and Celebrity knew full well that Defendant EMA are calling and harassing consumers in an attempt to procure business on behalf of the Defendants Assur and Celebrity. Defendants Assur and Celebrity willfully accept these referrals and compensate Defendant EMA for their illegal phone calls.

92.    No emergency necessitated none of the alleged phone calls.

93.    Plaintiff sent an internal do-not-call policy request to Defendant Assur to email info@assurloans.com on January 6, 2023 which is an email listed on their website they own and control https://assurloans.com.

94.    Plaintiff sent an internal do-not-call policy request to Defendant Celebrity to emails mem@midwestequity.com and licensing@celebrityhomeloans.com on January 6, 2023 which are emails listed on their websites they own and control https://www.midwestequity.com and https://celebrityhomeloans.com.

95.    Plaintiff sent an internal do-not-call policy request to Defendant EMA to email

jseckel@exclusive.agency on January 9, 2023 which is an email owned and controlled by Defendant Seckel.

96.     Despite this emails, Defendant Celebrity failed and/or refused to send Plaintiff a do-not-call policy.

97.     Upon information and belief, the Defendant Celebrity did not have a written do-not-call policy while it was sending Plaintiff the unauthorized phone calls.

98.     Upon information and belief, Defendant Celebrity did not train their agents who engaged in telemarketing on the existence and use of any do-not-call list.

99.     Such conduct violates the TCPA and its implementing regulations, 47 CFR § 64.1200(d)(3)(requiring telemarketers to honor and record DNC requests when made).

100.     Plaintiff searched the Texas Secretary of State website https://direct.sos.state.tx.us/telephone/telephonesearch.asp site ("Texas Registration Database") and did not find a valid Texas Solicitation Registration from Defendants Seckel or EMA as required by Texas Business and Commerce Code 302.101.

101.     Defendants Seckel and EMA do not qualify for an exemption under TX Bus. Com. Code 302.101.

102.     Plaintiff was harmed by these calls. Plaintiff was temporarily deprived of legitimate use of his phone because the phone line was tied up during the telemarketing calls and his privacy was improperly invaded. Moreover, these calls injured Plaintiff because they were frustrating, obnoxious, annoying, were a nuisance and disturbed the solitude of Plaintiff. The calls caused Plaintiff's cell phone battery's depletion, used up cellular data, and prevented Plaintiff from otherwise using his telephone for lawful purposes.

**VICARIOUS LIABILITY OF DEFENDANTS ASSUR AND CELEBRITY**

103.    Defendants Assur and Celebrity are vicariously liable for the telemarketing calls that generated the lead on their behalf.

104.    The FCC is tasked with promulgating rules and orders related to enforcement of the TCPA. 47 U.S.C. § 227(b)(2).

105.    The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

106.    The FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008) (recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

107.    The FCC confirmed this principle in a declaratory ruling holding that sellers such as Post may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because sellers may have thousands of independent marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote omitted)

(alteration marks and internal quotation marks omitted).

108.    More specifically, *Dish* held that, even in the absence of evidence of a formal contractual

relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the

telemarketer "has apparent (if not actual) authority" to make the calls.  *Id.* at 6586 ¶ 34.

109.    The ruling rejected a narrow view of TCPA liability, including the assertion that a seller's

liability requires a finding of formal agency and immediate direction and control over the third-

party who placed the telemarketing call. *Id.* at 6587 ¶ 36 & n.107.

110.    To the contrary, the FCC—armed with extensive data about robocalls and Americans'

complaints about them—determined that vicarious liability is essential to serve the TCPA's

remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at 6587

¶ 36.

111.    Vicarious liability is important because reputable, traceable, and solvent companies that

benefit from illegal telemarketing are "in the best position to monitor and police TCPA

compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

112.    Defendants Assur and Celebrity are legally responsible for ensuring that the affiliates that

make telemarketing calls on their behalf comply with the TCPA when so doing.

113.    Defendants Assur and Celebrity knowingly and actively accepted business that originated

through illegal telemarketing.

114.    Defendants Assur and Celebrity knew (or reasonably should have known) that Defendant

EMA was violating the TCPA on their behalf but failed to take effective steps within their power

to force Defendant EMA to cease that conduct.

115.    By hiring a company to make calls on its behalf, Defendants Assur and Celebrity "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

116.    Moreover, Defendants Assur and Celebrity maintained interim control over the actions of Defendant EMA.

117.    For example, Defendants Assur and Celebrity had absolute control over whether, and under what circumstances, they would accept a customer from Defendant EMA.

118.    Furthermore, Defendants Assur and Celebrity had day-to-day control over the actions of Defendant EMA, including the ability to prohibit them from using an ATDS to contact potential customers of Defendants Assur and Celebrity and the ability to require them to respect the National Do Not Call Registry.

119.    Defendants Assur and Celebrity also gave interim instructions to Defendant EMA by providing lead-qualifying instructions and lead volume limits.

120.    Defendants Assur and Celebrity donned Defendant EMA with apparent authority to make the calls at issue. Thus, the Defendant EMA's representatives pitched "mortgage refinance loans and cash out" services in the abstract.

121.    Apparent authority turns on whether a third party believes the principal authorized its agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03 cmt. c.

122.    "[A]pparent authority can arise in multiple ways and does *not* require that 'a principal's manifestation must be directed to a specific third party in a communication made directly to that person.'" *Dish*, 28 FCC Rcd. at 6586 ¶ 34 n.102 (quoting Restatement § 2.03 cmt. c).

123.    A principal may make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations, placing an agent in a position within an organization, or placing an agent in charge of a transaction or situation." Restatement § 2.03 cmt. c.

124.    Defendant EMA transferred customer information, including Plaintiff's contact information, directly to Defendants Assur and Celebrity. Thus, the telemarketer had the "ability . . . to enter consumer information into the seller's sales or customer systems," which the FCC has explained to show apparent agency. *Dish*, 28 FCC Rcd. at 6592 ¶ 46.

125.    Finally, the FCC has held that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

126.    Defendants Assur and Celebrity are the liable parties as the direct beneficiary of the illegal telemarketing calls as they stood to gain Plaintiff as a customer.

## DEFENDANT SECKLER IS PERSONALLY LIABLE

127.    Defendant Seckler refuses to take any action to stop or curtail the unlawful sales practices and illegal unauthorized phone calls because these practices benefit Defendant Seckler financially by generating potential leads for Defendants Assur and Celebrity.

128.    "If the officer directly participated in or authorized the statutory violation, even though

acting on behalf of the corporation, he may be personally liable.  See *United States v*

*Pollution Serv. Of Oswego, Inc.*, 763 F.2d 133, 134-135 (2nd Cir.1985)

129.    The "well-settled" tort rule provides that "when corporate officers directly participate in

or authorized the commission of a wrongful act, even if the act is done on behalf of the

corporation, they may be personally liable." *General Motos Acceptance Corp. v. Bates*, 954

F.2d 1081, 1085 (5th Cir. 1992).  The Fifth Circuit has elaborated that "the thrust of the

general [tort] rule is that the officer to be held personally liable must have some direct,

personal participation in the tort, as where the defendant was the 'guiding spirit' behind the

wrongful conduct….or the 'central figure' in the challenged corporate activity." *Mozingo v.*

*Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cirt. 1985) (Citing *Escude Cruz v. Ortho*

*Pharmaceutical Corp.*, 619 F. 2d 902, 907 (1st Cir.1980)) (Citing *Texas v. American Blastfax,*

*Inc.*, 164 F. Supp. 2d 892 (W.D. Tex. 2001)

130.    Quoting Texas v. American Blastfax:

> The Court finds the above principles applicable to the TCPA that is, an officer may be
> personally liable under the TCPA if he had direct, personal participation in or
> personally authorized the conduct found to have violated the statute, and was not
> merely tangentially involved.  Individuals who directly (and here, knowingly and
> willfully) violate the TCPA should not escape liability solely because they are
> corporate officers.  As the State persuasive argues, to hold otherwise would allow the
> individual defendants to simply dissolve Blastfax, set-up a new shell corporation, and
> repeat their conduct.  Congress surely did not intend to permit such a result in passing
> the TCPA.
>
> To be clear, the Court finds Greg and Michael Horne were the "guiding spirits" an the
> "central figures" behind the TCPA violations.  They were the two persons who
> controlled all of Blastfax's day-to-day operations.  They both had direct, personal
> involvement in and ultimate control over every aspect of Blastfax's wrongful contuct
> that violate the TCPA, and/or directly controlled and authorized this conduct.  And
> they did so with their eyes and pocketbooks wide open.  After October 5, 2000, Greg

and Michael Horne had good reason to believe they were running a business that violated the TCPA. On February 9, 2001, they knew they were. Yet they continued to direct their company to send unsolicited intrastate fax advertisements. This is fare more than a simple derivative liability case. Accordingly, the Court *899 holds defendants Greg and Michael Horne are jointly and severally liable with Defendant Blastfax, Inc., for all TCPA damages in this lawsuit." Texas v. American Blastfax, Inc., 164 F. Supp. 2d 892 (W.D. Tex. 2001)

131.    The Same Court held that corporate officers were also personally liable for DTPA violations

The State contends Greg and Michael Horne are personally liable for any DTPA damages because they were solely responsible for the violating conduct.....For the same reasons discussed in finding the individual defendants personally liable under the TCPA, the Court agrees. See, e.g., *Barclay v. Johnson*, 686 S.W.2d 334, 336-37 (Tex. Civ. App.-Houston [1ST Dist.] 1985, no writ) (finding personal liability for corporate officer in DTPA misrepresentation claim, based on general rule that "a corporate agent knowingly participating in a tortious of fraudulent act may be held individually liable, even though he performed the act as an agent for the corporation......Accordingly, the Court finds defendants American Blastfax, Inc., Greg Horne and Michael Horne are jointly and severally liable for $6,000 in damages for their violations of the DTPA." *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892 (W.D. Tex. 2001

131.    At all times material to the Complaint, acting alone or in concert with others, Defendant Seckler has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendant EMA including the acts or practices set forth in this Complaint.

132.    Defendant Seckler is the principal director and operator of Defendant EMA controls the day-to-day operations of Defendant EMA and directed their representatives, employees, agents, salespersons, and telemarketers to make TCPA violating phone calls to solicit mortgage loan services on behalf of Defendants Assur and Celebrity.

133.    Defendant Seckler knowingly and willfully ignores the law. These violations are the direct result of the instructions Defendant Seckler has given to his telemarketers,

20

representatives, agents, employees, solicitors, salespersons, and others that carry out his schemes.

134.    Defendant Seckler is not merely a bystander and is the mastermind that scheme, planned, directed, initiated, and controlled the illegal and fraudulent behavior.

135.    Defendant Seckler is well aware their conduct violated the TCPA and Tex. DPTA and refused to alter his behavior.  Defendant Seckler is the sole director of Defendant EMA and the only person with the power to make the unlawful, fraudulent, and unethical behavior stop.  Yet, Defendant Seckler has taken no steps to stop the behavior because the behavior benefits him financially.

136.    Defendant Seckler should be held jointly and severally liable for both the TCPA violations and via the Tex. DTPA because he actually committed the conduct that violated the TCPA and Tex. DTPA, and/or he actively oversaw and directed this conduct.

137.    Defendant Seckler should be held liable because to do otherwise would simply allow him to dissolve Defendant EMA and set up a new corporation and repeat his conduct.  This would result in both the TCPA and DTPA being unenforceable.

## INJURY, HARM, DAMAGES, AND ACTUAL DAMAGES AS A RESULT OF THE CALLS

138.    Plaintiff has been denied the use of his phone, enjoyment of his phone, and had the functionality of his phone decreased because of unnecessary charging, erosion of phone memory, and had his privacy invaded by the harassing illegal phone calls.

139.    Defendants' calls harmed the Plaintiff by causing the very harm that Congress sought to prevent a "nuisance and invasion of privacy."

140.    Plaintiff has been annoyed, harassed, and irritated by unauthorized calls placed by and/or

on behalf of Defendants.

141.    Defendants' calls harmed the Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone by placing unwanted telemarketing calls to the Plaintiff.

### THE PLAINTIFF'S CELL PHONE IS A RESIDENTIAL NUMBER

142.    The calls were to the Plaintiff's cellular phone 0898, which is the Plaintiff's personal cell phone that he uses for personal, family, and household use. The Plaintiff maintains no landline phones at his residence and has not done so for at least 10 years and primarily relies on cellular phones to communicate with friends and family. The Plaintiff also uses his cell phone for navigation purposes, sending and receiving emails, timing food when cooking, and sending and receiving text messages. The Plaintiff further has his cell phone registered in his personal name, pays the cell phone from his personal accounts.

### Violations of the Texas Business and Commerce Code 305.053

143.    The actions of the Defendants Seckler and EMA violated the Texas Business and Commerce Code 305.053 by placing illegal phone calls to a cell phone which violates 47 USC 227(b). The calls by Defendants Seckler and EMA violated Texas law by placing illegal telemarketing calls to a cell phone which violates 47 USC 227(c)(5) and 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e).

144.    The calls by Defendants Seckler and EMA violated Texas law by spoofing the caller IDs per 47 USC 227(e) which in turn violates the Texas statute.

### Violations of the Texas Business and Commerce Code § 302.101

145.    The actions of the Defendants Seckler and EMA violated the Texas Business and Commerce Code 302.101 by placing solicitation phone calls to a Texas resident without having

registration certificate and bond on file with the Texas Secretary of State.

146.     Texas Business and Commerce Code § 302.101 provides a private right of action.  A violation of Chapter 302 "is a false, misleading, or deceptive act or practice under Subchapter E, Chapter 17" and is enforceable as such: "A public or private right or remedy prescribed by Subchapter E, Chapter 17, may be used to enforce [Chapter 302." Tex. Bus. & Com. Code § 302.303.

147.     The use or employment by any person of a false, misleading, or deceptive act or practice" causes "economic damages or damages for mental anguish." Tex. Bus. & Com. Code § 17.50.

148.     Texas Business and Commerce Code §302.101 states that a person (1) "may not make a telephone solicitation" (a) "from a location in [Texas]" or (b) "to a purchaser located in [Texas]," (2) "unless the [person] holds a registration certificate for the business location from which the telephone solicitation is made." Tex. Bus. & Com. Code § 302.101(a).

## CAUSES OF ACTION:

### COUNT ONE:
### Violations of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by Automated Telemarketing Without Prior Express Written Consent

149.     Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

150.     Defendants and/or their affiliates or agents violated the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), at least eleven (11) times by placing non-emergency telemarketing calls to Plaintiff's cellular telephone number using an automatic telephone dialing system without prior express written consent.

151.    Plaintiff was statutorily damaged at least eleven (11) times under 47 U.S.C. §

227(b)(3)(B) by Defendants by the telephone calls described above, in the amount of $500.00 per

call.

152.    Plaintiff was further statutorily damaged because Defendants willfully or knowingly

violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount

to $1,500.00 as permitted under U.S.C. § 227(b)(3)(C) for each and every willful and/or knowing

violation.

153.    Plaintiff is also entitled to and does seek an injunction prohibiting Defendants and their

affiliates and agents from violating the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by placing non-

emergency telemarketing calls to any cellular telephone number using an ATDS and/or without

prior express written consent.

## COUNT TWO:
### (Violation of the TCPA "Sales Call/DNC" Prohibition, 47 U.S.C. 227(c), and 47 C.F.R. § 64.1200(C))

154.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the

preceding paragraphs.

155.    Defendants called Plaintiff's private residential telephone number which was successfully

registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls

for the purposes of commercial solicitation, in violation of 47 U.S.C. § 227(c)(3)(F), and 47

C.F.R. § 64.1200(c)(2).

156.    Plaintiff was statutorily damaged at least sixteen (16) times under 47 U.S.C. §

227(c)(3)(F) by Defendants by the telemarketing calls described above, in the amount of $500.00

per call.

157.    Plaintiff was further statutorily damaged because Defendants willfully and/ or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount as permitted under U.S.C. § 227(c)(5) for each and every willful and/or knowing violation.

158.    Plaintiff is entitled to an award up to $1,500 in damages for each knowing or willful violation of 47 U.S.C. § 227(c)(3)(F).


## COUNT THREE:
### Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d)

159.    Plaintiff incorporates the forgoing allegations as if fully set forth herein.

160.    The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of FCC regulations by making telemarketing solicitations despite lacking the following:

  a.  A written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1) [2];

  b.  Training for the individuals involved in the telemarketing on the existence of and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2) [3]; and,

  c.  In the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4). [4]

---

[2] *See id.* at 425 (codifying a June 26, 2003 FCC order).
[3] *See id.* at 425 (codifying a June 26, 2003 FCC order).
[4] *See id.* at 425 (codifying a June 26, 2003 FCC order

161.    Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

162.    Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

## COUNT FOUR

### Violations of The Texas Business and Commerce Code 305.053

163.    Plaintiff incorporates the foregoing allegations as if set forth herein.

164.    The foregoing acts and omissions of Defendants Assur and Celebrity and/or their affiliates or agents constitute multiple violations of the **Texas Business and Commerce Code 305.053**, by making non-emergency telemarketing calls to Mr. Salaiz cellular telephone number without his prior express written consent in violation of 47 USC 227 et seq. Defendants Assur and Celebrity violated 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e) by using an ATDS that does not comply with the technical and procedural standards under this subsection.

165.    Plaintiff is entitled to an award of at least $500 in damages for each such violation. **Texas Business and Commerce Code 305.053(b)**

166.    Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. **Texas Business and Commerce Code 305.053**(c)

## COUNT FIVE:
### (Violations of The Texas Business and Commerce Code 302.101)

167.    Plaintiff incorporates the foregoing allegations as if set forth herein. by reference each and every allegation set forth in the preceding paragraphs.

168.    The foregoing acts and omissions of Defendants Assur and Celebrity and/or their affiliates or agents constitute multiple violations of the Texas Business and Commerce

Code 302.101, by making non-registered solicitation calls to Plaintiff's cellular telephone number without his prior express written consent.

169.     Plaintiff is entitled to an award of up to $5,000 in damages for each such knowing or willful violation. Texas Business and Commerce Code 302.302.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Erik Salaiz prays for judgment against the Defendants jointly and severally as follows:

A.     Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

B.     A declaration that actions complained of herein by Defendants violate the TCPA and Texas state law;

C.     An award of $1500 per call in statutory damages arising from the TCPA §227(b) intentional violations jointly and severally against the individual and corporations for eleven calls.

D.     An award of $1500 per call in statutory damages arising from the TCPA §227(c) intentional violations jointly and severally against the individual and corporations for sixteen calls.

E.     An award of $1,500 in statutory damages arising from violations of the Texas Business and Commerce code 305.053

F.      An award of $5,000 in statutory damages arising from violations of the Texas Business and Commerce code 302.101 intentional violations jointly and severally against Seckler and EMA for eleven calls.

G.      An award to Plaintiff of damages, as allowed by law under the TCPA;

H.      An award to Plaintiff of interest, costs and attorneys' fees, as allowed by law and equity.

I.      Such further relief as the Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

January, 20, 2023,          Respectfully Submitted,

Erik Salaiz
Plaintiff, Pro Se
319 Valley Fair Way
El Paso, Texas 79907
915-490-0898
Salaiz.ep@gmail.com

28